IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| DONALD TIMMER, | CV 25–51–BU–DWM |
| Plaintiff, | |
| vs. | OPINION<br>and ORDER |
| SCOTT SIEGAL and JAMSCO, INC., | |
| Defendants. | |

On May 21, 2025, Plaintiff Donald Timmer filed a complaint alleging his civil rights were violated by several private parties when they conspired to terminate him from his employment using fabricated allegations of sexual misconduct. (Doc. 1.) He further alleged that his termination violated state statutory and common law. (*See id.*) Following a series of amendments and dismissals, Timmer most recently filed his Third Amended Complaint. (Doc. 42.) In that pleading, he names just two defendants, Defendants Scott Siegal and Jamsco, Inc. (together, "Defendants"). Defendants seek to dismiss the Third Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. (Doc. 44.) Defendants have also moved to transfer venue over any surviving claims to the District of Maryland. (Doc. 53.) Defendants' motion to dismiss is granted, mooting their motion to transfer.

1

BACKGROUND

At this stage, Timmer's allegations are assumed true and construed in his favor. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114 (9th Cir. 2021).

## I.    Factual History

In 2008, Timmer, who owned his own roofing company in Montana, became a member of Certified Contractors Network,[1] a home construction management consulting network that offers resources and training for sales, marketing, and management. (Doc. 42 at ¶¶ 6, 7.)  Approximately four years later, Timmer decided to wind up his business. (*Id.* ¶ 8.)  After he communicated that decision to Certified Contractors Network, Defendant Scott Siegal, the President and Owner of Certified Contractors Network, sent Timmer a LinkedIn message asking if he wanted to become part of Certified Contractors Network's Executive Team. (*Id.* ¶ 9.)  Timmer accepted and began to work for Siegal. (*Id.* ¶ 9.)

In 2021, Certified Contractors Network hired Gary Cohen "to lead its day-to-day operations" as its Vice President. (*Id.* ¶ 12.)  Shortly after Cohen's arrival, it was made clear to Certified Contractors Network members and partners that the leadership believed Timmer was "on his way out." (*Id.* ¶ 18.)  Cohen openly expressed his dislike for Timmer and made attempts to sabotage Timmer's

---

[1] Certified Contractors Network is a d/b/a for Certified Contractors Supply, the defendant previously dismissed from this matter. (*See* Doc. 41.)  To avoid confusion, the business is referred to as Certified Contractors Network herein.

relationship with his colleagues and clients with the end goal of terminating Timmer's employment. (*Id.* ¶¶ 19–20.) These issues came to a head at a conference in September 2024 when Timmer was wrongfully accused of sexually assaulting a female attendee named Danielle Jones by "slapping [her] on the butt." (*Id.* ¶¶ 22–41.) After the conference, Siegal informed Timmer that he was going to be contacted by a third-party human resources consultant, Tim Carrington, about the incident. (*Id.* ¶ 29.) In his subsequent conversation with Carrington on September 26, 2024, Timmer unequivocally denied touching Jones inappropriately, and Carrington refused to reveal any further information about what he characterized as an ongoing investigation. (*Id.* ¶¶ 34–36.) On September 27, 2024, Siegal and Carrington jointly called Timmer and informed him that his employment was being terminated. (*Id.* ¶¶ 37–41.) On September 30, 2024, Timmer reached out to Carrington, requesting further information about the complaint. (*Id.* ¶¶ 42–44.) Carrington refused to provide any. (*Id.* ¶ 44.)

Subsequently, Timmer began to engage in his own investigation of the complaint against him and the company policies/guidelines. (*Id.* ¶¶ 45–49.) In January 2025, Carrington sent Timmer a "cease and desist" letter on behalf of Certified Contractors Network, directing Timmer to stop communicating with Certified Contractors Network members per the terms of a non-compete agreement Timmer had signed in 2013 (the "Confidentiality Agreement). (*Id.* ¶ 49; *see* Doc.

52-1.) Timmer disagreed that he violated the Agreement, which he maintains is geographically limited. (Doc. 42 at ¶¶ 49–50.) Timmer also alleges that Carrington forged a more expansive non-compete agreement. (*Id.* ¶¶ 49, 50.)

## II.   Procedural History

In May 2025, Timmer filed his initial complaint, which alleged claims against various individuals and companies associated with Siegal and Certified Contractors Network under 42 U.S.C. § 1983, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state law. (*See* Doc. 1.) On August 29, 2025, Defendants Stacy Siegal, Scott Siegal, and Jamsco, Inc. filed motions to dismiss. (Docs. 8, 10.) No other defendants appeared and Timmer did not respond to either motion or file proof of service for any other defendants. Accordingly, on October 17, 2025, Timmer was ordered to respond and provide proof of service for the remaining defendants. (Doc. 14.) The pending motions to dismiss were ultimately granted, but with leave to amend. (Doc. 19.)

On October 29, 2025, Timmer filed his First Amended Complaint. (Doc. 20.) That pleading alleged a single cause of action for statutory wrongful discharge from employment and named only two defendants, Jamsco and Certified Contractors Network. (*Id.*) Timmer sought leave to amend again on November 7, 2025, on the basis that he should have named Certified Contractors Supply instead of Certified Contractors Network. (Doc. 22.) Leave was granted, (Doc. 23), and

4

on November 20, 2025, Timmer filed a Second Amended Complaint alleging a single cause of action for wrongful discharge against Defendants Jamsco, Certified Contractors Supply, and Does 1–10. (Doc. 24.)

On December 1, 2025, Jamsco answered. (Doc. 30; *see* Doc. 31.) On December 18, 2025, Certified Contractors Supply filed a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. (Doc. 32.) Following a hearing, (*see* Doc. 38), that motion was granted, and Timmer was given leave to file a final amended pleading, (Doc. 41).

On January 30, 2026, Timmer filed his Third Amended Complaint, which is the operative pleading. (Doc. 42.) Timmer alleges the following claims against Defendants Scott Siegal and Jamsco, Inc. (together, "Defendants"): defamation, defamation per se, wire fraud, mail fraud, unfair employment practices, breach of fiduciary duty, negligence, negligence per se, civil rights (42 U.S.C. § 1983) violations, tortious interference with past, present and future business relationships, and bad faith breach of contract. (*Id.* at ¶¶ 56–68.)

On February 12, 2026, Defendants filed a motion to dismiss Timmer's claims under Rule 12(b)(6). (Doc. 44.) On March 17, 2026, the parties were *sua sponte* ordered to brief choice of law. (Doc. 49.) They did so, (Docs. 50, 51, 52), and Defendants also filed a motion to transfer venue to the District of Maryland, (Doc. 53), which Timmer opposes, (Doc. 56).

5

**ANALYSIS**

Based on the facts and circumstances of this case, Timmer's claims are governed by Maryland law. Applying that law here, the Third Amended Complaint falls far short of stating a plausible claim for relief.[2] Because Timmer has been given multiple opportunities to amend, no further leave is permitted. The Third Amended Complaint is dismissed with prejudice.

## I.    Choice of Law

Because neither party originally briefed the choice of law issue, they were ordered to do so. (Doc. 49.) In his supplemental brief, Timmer did not analyze choice of law or propose a governing law, but rather argued that the case should remain venued in Montana. (Doc. 50.) In their supplemental brief, Defendants argued that Maryland law should apply to both the contract- and tort-based claims, (Doc. 51), and attached the Confidentiality Agreement Timmer signed in 2013, which contains a choice of law provision selecting Maryland law, (Doc. 52-1). Defendants are correct that Maryland law applies here.

A federal court sitting in diversity applies the choice of law rules of the state in which it sits—here, Montana. *See, e.g., Patton v. Cox*, 276 F.3d 493, 495 (9th

---

[2] Defendants also argue that the Third Amended Complaint should be dismissed because Timmer failed to provide proof of service as required by this Court's January 23, 2026 Order, (*see* Doc. 41). While Timmer's failure to comply with a Court order justifies the dismissal of his claim, *see* Fed. R. Civ. P. 41(b), dismissal is not ordered on this ground.

6

Cir. 2002) (citing *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Where a conflict arises regarding which state's substantive law applies to a particular action, [Montana] appl[ies] the approach from the Restatement (Second) on Conflict of Laws." *Buckles v. BH Flowtest, Inc.*, 476 P.3d 422, 424 (Mont. 2020) (citing *Phillips v. GMC*, 995 P.2d 1002, 1007 (Mont. 2000)). "The flexible approach of the Restatement calls for application of its principles on an issue-by-issue basis." *Barber v. Bradford Aquatic Grp., LLC*, 539 P.3d 648, 651 (Mont. 2023). Here, Timmer has pled both contract- and tort-based state law claims. They are discussed in turn below.

### A.   Contract Claim

The Third Amended Complaint pleads a cause of action for bad faith breach of contract. (Doc. 42 at ¶ 68.) Although Timmer does not identify which contract he believes was breached, there appears to be a single written contract between the parties, the "Confidentiality Agreement" that is referenced above and was entered into on January 24, 2013 (the "Agreement"). (*See* Doc. 52-1.) Because that contract is incorporated by reference in the Third Amended Complaint, it is properly considered here. Fed. R. Civ. P. 10(c); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). That Agreement contains the following choice of law language: "This agreement shall be governed by and interpreted, construed and enforced in accordance with the law of the State of Maryland without regard to

conflicts of law principles." (Doc. 52-1 at ¶ 6.) Based on this provision,

Defendants argue that Maryland law applies to this claim. They are correct.

Montana "rel[ies] on the Restatement [(Second) on Conflict of Laws] §§ 6,

187, and 188 for determining the validity of choice of law clauses." *Barber*, 539

P.3d at 651. Where a contract contains an explicit choice of law clause, the

analysis follows § 187, which provides:

> (1) The laws of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state had no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention the reference is to the local law of the state of the chosen law.

*Id.* (quoting Restatement (Second) on Conflict of Laws § 187). In contrast, § 188,

which considers which state has the most "significant relationship to the

8

transaction and the parties," governs situations where there is no effective choice of law provision. *See Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 400 (Mont. 2008). Because the Confidentiality Agreement contains an explicit choice of law provision, the analysis proceeds under § 187.

"Considering the Restatement § 187(1), parties generally are free to determine the terms of their dealings." *Barber*, 539 P.3d at 651. "In Montana, parties enjoy a broad freedom to contract around the terms of their private dealings so long as their agreements do not conflict with public policy." *Id.* Here, Timmer does not claim he was unable to bargain for terms in the Agreement; to the contrary, his pleading takes the position that the limited geographical scope of the Agreement's non-compete provisions favors Timmer. (*See* Doc. 42 at ¶¶ 49–50.) "It was within the parties' prerogative to determine that [Maryland] law would govern their relationship." *Barber*, 539 P.3d at 651. Consistently, under the Restatement § 187(1), Maryland law applies to Timmer's breach of contract claim.

But even if Timmer could plausibly argue that the issue is not one the parties could have resolved by an explicit provision in the Agreement, § 187(2) also compels the application of Maryland law. Under § 187(2), Montana applies the law of the state chosen by the parties unless three factors are met:

> (1) if, but for the choice-of-law provision, Montana law would apply under § 188 of the Restatement;

(2) if Montana has a materially greater interest in the particular issue than the state chosen by the parties; and

(3) if applying the state law chosen by the parties would contravene a fundamental policy of Montana.

*Id.* at 652 (quoting *Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 400 (Mont. 2008)). "All three conditions must be met." *Masters Grp. Int'l, Inc. v. Comerica Bank*, 352 P.3d 1101, 1113 (Mont. 2015). Here, even assuming Maryland law governing restrictive covenants contravenes a fundamental policy of Montana, *compare Access Organics, Inc. v. Hernandez*, 175 P.3d 899, 902–03 (Mont. 2008) (explaining that in Montana, restrictive covenants "will not be extended by implication") *with Allegis Grp., Inc. v. Bero*, 689 F. Supp. 3d 81, 119 (D. Md. 2023) (permitting courts in Maryland to reform an otherwise overbroad covenant "by excising, or 'blue penciling,' unreasonable language"), the first two requirements of § 187(2) are not met. Accordingly, the parties' contractual choice of Maryland law is enforced.

## 1.    Section 188

Section 188(1) of the Restatement governs situations where there is no effective choice of law and provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." In turn, § 6(1) states that "[a]

10

court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Montana law provides that a "contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Mont. Code Ann. § 28–3–102. The Confidentiality Agreement does not identify a place of performance or the domicile/location of either party. (*See* Doc. 52-1.) "[T]he fact that [Timmer]'s territory included Montana . . . [as well as other] states and as one among a potentially nationwide scope of work is insufficient for [the Court] to infer that Montana was the place of performance." *Barber*, 539 P.3d at 653. In the absence of an identified place of performance, the relevant inquiry is where the contract was made. Although not pled in the Third Amended Complaint, the record indicates the Confidentiality Agreement was executed in California. (*See* Doc. 46 at 14 (Timmer testifying that he "signed some documents" related to his employment while at a conference in San Jose, California in January 2013).) Irrespective of Timmer's purported intent to work remotely from Montana, "neither he nor [Siegal] was in Montana when they executed the Agreement." *Barber*, 539 P.3d at 653. Thus, it is not the case that "but for the choice-of-law provision, Montana law would apply under § 188 of the Restatement." *Barber*, 539 P.3d at 652 (internal quotation marks omitted).

### 2.    Materially Greater Interest

11

To determine whether Montana has a "materially greater interest" in an issue than the chosen forum, Montana courts "have focused on the contacts enumerated in § 188(2) of the *Restatement*: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e), the domicil, residence, nationality, place of incorporation and place of business of the parties." *Modroo*, 191 P.3d at 402 (internal quotation marks omitted).  These contacts are evaluated "according to the relative importance they bear on the particular issue." *Id.*  According to the Restatement commentary, "the place of contracting is a relatively insignificant contact," while the "place of negotiation" and "place of performance" are often more significant contacts.  *See* § 188, cmt. e.

Here, California was the place of contracting, (*see* Doc. 46 at 14); there is no place of performance, (*see* Doc. 52-1); Timmer's first contact with the company was in Nevada, (Doc. 42 at ¶ 6); Timmer worked remotely from his residence in Montana but traveled consistently outside the state for his work, (*id.* ¶ 1; Doc. 46 at 15–16); Siegal is a citizen and resident of Maryland, (*id.* ¶ 2); and Certified Contractors Network is a Maryland company, (*see id.* ¶¶ 3, 54).  Given these diverse contacts, it does not seem that, of all the potential forums, Montana has the materially greatest interest.  *See Barber*, 539 P.3d at 654 (explaining that while the fact work would be performed in Montana gives the state "an interest in the issues

12

involved," it does not mean that "Montana has a materially greater interest in governing the Agreement" than the "employer's home state [or] the state chosen by the parties."). Maryland law applies to Timmer's contract claim.

## B.    Tort Claims

The Third Amended Complaint also contains several state law tort claims, including defamation, (Doc. 42 at ¶ 56); unfair employment practices,[3] (*id.* ¶ 59); breach of fiduciary duties, (*id.* ¶ 60); negligence, (*id.* ¶ 61); and tortious interference with business relationships, (*id.* ¶ 67). Because "[t]here is no statutory directive regarding choice of law in Montana for issues sounding in tort," courts must "consider[] principles outlined in § 6(2)" of the Restatement, which include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in determination of a particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

---

[3] This claim also contains reference to a "violation of the employment laws of the United States" and "the Medical Family Leave Act." (Doc. 42 at ¶ 59.)

*Buckles*, 476 P.3d at 424–25 (internal quotation marks omitted).  These factors must be considered along "with the specific section of the Restatement that is applicable to the case," which in the context of torts and personal injury actions is Restatement §§ 145, 146, and 175.  *Id.*  "In doing so, [courts] begin with the initial presumption stated in § 145(1), and reiterated in §§ 146 and 175, which 'provide[s] that the rights and liabilities of the parties are to be determined in accordance with the law of the state where the injury occurred . . . .'"  *Id.* at 425 (quoting Restatement § 145) (alterations in original).

However, the § 145 presumption is not irrebuttable, and "[t]he law of the state of the injury will not control if, with respect to a particular issue, another state has a more significant relationship."  *Id.* (internal quotation marks omitted).  The following contacts are considered to determine which state has the "most significant relationship":

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

*Id.* (quoting Restatement § 145(2)).  These contacts "are to be evaluated according to their relative importance with respect to the particular issue."  *Id.* (internal

14

quotation marks omitted). Nevertheless, when the injury and the conduct that caused it occurred in different states, the commentary to § 146 explains that:

> The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there. When, however, the injured person is domiciled or resides or does business in the state where the conduct occurred, there is a greater likelihood that this state is to be the state of most significant relationship and therefore the state of the applicable law with respect to issues that would usually be determined by the local law of the state of injury.

*Id.* (citing Restatement § 146, cmt. e). Consistently, determining the applicable law turns on defining where the conduct that caused the injury occurred and where the parties' relationship was centered. *See id.*

As argued by Defendants, Maryland has a more significant relationship with Timmer's tort claims than Montana. The crux of Timmer's claims is that Defendants, in conjunction with an independent human resources firm out of Maryland, mishandled the sexual assault complaint and subsequent investigation arising out of the Kentucky conference, which resulted in his termination. (*See id.* ¶¶ 29–53.) Maryland has the most significant relationship with these allegations. The only connection between Montana and the claims is Timmer's presence.

### C. Conclusion

Accordingly, Timmer's state law claims are governed by Maryland law.

## II. Rule 12(b)(6) Motion

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted). At this stage, the plaintiff's allegations are assumed to be true and construed in his favor. *See Ariix*, 985 F.3d at 1114. Because Timmer fails to state a plausible claim for relief under either Maryland or federal law, Defendants' motion to dismiss is granted.

## A.    Defamation

To plead defamation under Maryland law, a plaintiff must allege facts establishing the following four elements: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff

thereby suffered harm."[4] *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 448 (Md. App. Ct. 2009). "For the purposes of the first element, a 'defamatory statement' is one that tends to expose a person to public scorn, hatred, contempt, or ridicule, which, as a consequence, discourages others in the community from having a good opinion of, or associating with, that person." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. App. Ct. 2012) (internal quotation marks omitted). "Under the second element, a 'false' statement is one that is not substantially correct." *Id.* (internal quotation marks omitted). "The plaintiff carries the burden to prove falsity." *Id.*

Here, Timmer alleges that Defendants or their agents "have publicly stated and[] implied that Troy Timmer is guilty of sexually assaulting Danielle Jones at the September 2024, Louisville, Kentucky conference sponsored by [Defendants]." (Doc. 42 at ¶ 56.) Timmer has identified only three specific statements that may form the basis of this claim. First, at a September 21, 2024 Steering Committee Meeting, Siegal told those in attendance that "Timmer would not be at the meeting as a sexual assault complaint had been filed against [him]." (*Id.* ¶ 22.) Second, on September 23, 2024, Siegal emailed one of the Kentucky event attendees, Michelle

---

[4] Timmer has pled both defamation and defamation per se. Under Maryland law, defamation per se means that because "the[] injurious character" of the lies is "self-evident," it "need not be pleaded or proved." *Royall v. Dicks*, ___ A.3d ___, 2026 WL 915029, at *4 (Md. App. Ct. Apr. 3, 2026). Because Timmer has failed to allege a defamatory statement, this distinction is not material here.

Coors, to discuss the incident. (*Id.* ¶ 23.) Third, on September 25, 2024, Siegal sent a text message and an email to two other conference attendees to ask if they "had witnessed [Timmer] slapping Danielle Jones on the butt during the welcome reception." (*Id.* ¶¶ 30–31.) None of these statements supports a defamation claim.

Siegal's comment to the Steering Committee was that a sexual assault complaint had been filed against Timmer, not that Timmer had committed a sexual assault or had been found guilty of such conduct. While Timmer disagrees that a sexual assault occurred and believes that the investigation into that incident was handled improperly, that does not mean a complaint was not made against him. Though Siegal's comment was inappropriate, Timmer fails to show they were "false" as that term is used in this context. As it relates to Siegal's correspondence with other conference attendees, Timmer has alleged that Siegal was inquiring about what they had observed in both instances. While "[a] mere inference, implication, or insinuation is as actionable as a positive assertion if the meaning is plain," *Batson v. Shiflett*, 602 A.2d 1191, 1211 n.14 (Md. App. Ct. 1992), the above inquiries are a far cry from a specific defamatory statement.

Other than a statement Siegal made directly to Timmer, (*see* Doc. 42 at ¶ 39), the Third Amended Complaint does not identify any specific statements made by Siegal or his purported "agents" to third parties regarding the sexual assault incident. Accordingly, Timmer's defamation claim fails as a matter of law.

### B.   Fraud – 18 U.S.C. § 1961

The only mechanism for bringing a private action for mail and/or wire fraud is through the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1861–68.  Adequately pleading a RICO claim is onerous.  "Broadly speaking, there are two parts to a civil RICO claim.  The civil RICO violation is defined under 18 U.S.C. § 1962, while 'RICO standing' is defined under 18 U.S.C. § 1964(c)."  *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (footnote omitted). RICO standing under § 1964(c) requires a plaintiff to show "(1) that his alleged harm qualifies as an injury to business or property; and (2) that his harm was 'by reason of' the RICO violation."  *Id.*  Timmer's pleading shows neither.

Moreover, to state a substantive RICO claim under § 1962, a plaintiff must allege: (1) that a "person" within the scope of the statute (2) has utilized a "pattern of racketeering activity" or the proceeds thereof (3) to infiltrate an interstate "enterprise" (4) by, *inter alia*, acquiring or maintaining an interest in the enterprise through the pattern of conducting the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)).  Timmer's RICO claims fail almost every pleading requirement.  While he uses the word "enterprise," (*see, e.g.*, Doc. 42 at ¶ 3), and cites to 18 U.S.C. § 1962(c), (*see id.* ¶ 4), he fails to plead the essential elements of an enterprise.  *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*,

19

751 F.3d 990, 997 (9th Cir. 2014) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). He also fails to show how Defendants' purported use of wires or mail furthered the purposes of that enterprise. "Racketeering activity is defined in RICO to mean any act or threat involving specified state-law crimes, any act indictable under various specified federal statutes, and certain federal offenses." *H.J. Inc. v. Bell Tel. Co.*, 492 U.S. 229, 232 (1989) (quotation marks omitted). As a result, racketeering activity requires predicate acts, *see* 18 U.S.C. § 1961(1), such as mail fraud, *id.* § 1341, or wire fraud, *id.* § 1343. To the extent any predicate acts sound in fraud, pleading those acts must satisfy the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, meaning "the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986). No such facts have been pled here. Finally, a "pattern of racketeering activity" "requires at least two acts of racketeering activity" that occur within ten years of one another. 18 U.S.C. § 1961(5). Once again, while Timmer uses the word "pattern," (*see, e.g.*, Doc. 42 at ¶ 58), he does not allege any specific use of mail or wires to show such a pattern. Timmer falls woefully short of stating a RICO claim.

### C.    Unfair Employment Practices

Timmer alleges that he was subjected to unfair employment practices related to his termination; more specifically, "employment related misrepresentation, employment related defamation, employment related wrongful discipline, employment related due process violations, employment related wrongful infliction of emotional distress, and employment related negligence associated with the investigation of human resource complaints and/or other employment related offenses." (Doc. 42 at ¶ 59.) He also alleges that Defendants engaged in discrimination, retaliation, workplace harassment, and violations of the "Medical Family Leave Act." (*Id.*) To the extent a cause of action can be discerned, Timmer has failed to plead a claim under the Family Medical Leave Act ("FMLA") or for wrongful discharge under Maryland law.

Starting with Timmer's purported federal claim, a plaintiff can bring a private action against a private employer for interference with an employee's rights under the FMLA. *See* 29 U.S.C. § 2617. Such a claim can take two forms, a claim for retaliation under 29 U.S.C. § 2615(a)(2) and (b), or interference under 29 U.S.C. § 2615(a)(1). A claim that an employer has taken adverse action against an employee for the employee's exercise of his FMLA rights is properly classified as an interference claim, *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001), while a retaliation claim is limited to "where an employee is punished

21

for *opposing* unlawful practices by the employer," *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003). Timmer has alleged neither.

Turning to his potential state-based employment claims, "[t]he common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Yuan v. Johns Hopkins Univ.*, 157 A.23d 254, 262 (Md. App. Ct. 2017) (internal quotation marks omitted). The only exception to this at-will employment rule is "when the motivation for the discharge contravenes some clear mandate of public policy." *Id.* (internal quotation marks omitted). Consistently, "[f]or an at-will employee to establish wrongful termination, the employee must be discharged, the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee." *Id.* (internal quotation marks omitted). Here, "[t]here is no clearly discernible public policy to support [Timmer's] claim of wrongful termination." *Id.* at 264. Moreover, to the extent Timmer's claims are based on Defendants' failure to adequately investigate the underlying sexual assault complaint, an "employer simply has no duty to investigate allegations of employee misconduct prior to discharging the employee." *Bagwell v. Peninsula Reg. Med. Ctr.*, 665 A.2d 297, 321 (Md. Ct. Spec. App. 1995). This claim fails.

### D.    Breach of Fiduciary Duty

22

To prevail on a claim for breach of fiduciary duty, a party must prove: "(1) the existence of a fiduciary relationship, (2) a breach of duty owed by the fiduciary to the beneficiary, and (3) harm resulting from that breach." *Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 665 A.2d 1038, 1046 (Md. App. Ct. 1995). Timmer alleges that because of his 11 years of employment with Certified Contractors Network, "a fiduciary relationship developed between the parties, similar or equivalent to the relationships in a business partnership and/or business joint venture." (Doc. 42 at ¶ 60.) He further alleges that Defendants breached their fiduciary duties to him by accusing him of sexual assault and sending the January 14, 2025 "cease and desist letter." (*Id.*) Timmer's fiduciary claim fails at the first step. While business partners owe each other fiduciary duties of loyalty and care, along with an obligation of good faith and fair dealing, *see* Md. Code Ann. § 9A-404, "partnership" is defined as "an association of two or more persons to carry on as co-owners a business for profit formed under § 9A-202 of [the Maryland Code]," *see* Md. Code Ann. § 9A-101(i). Timmer has not shown that he was a "partner" in Certified Contractors Network; to the contrary, the foundation of his pleading is that he is a wrongfully terminated employee. As such, the parties' rights and obligations vis-à-vis one another are the product of an at-will employment contract. *See Adler v. Am. Standard Corp.*, 432 A.2d 464, 467 (Md.

23

App. Ct. 1981) (explaining that such a contract "can be legally terminated at pleasure"). Accordingly, Timmer's claim for breach of fiduciary duty fails.

## E.    Negligence

"In order to recover damages in a negligence action, the plaintiff must establish (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty[,] (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."[5] *Wankel v. A&B Contrs.*, 732 A.2d 333, 348 (Md. Ct. Spec. App. 1999) (internal quotation marks omitted). The Third Amended Complaint does not identify what specific duties were owed or how those duties were breached. (*See* Doc. 42 at ¶ 61.) Maryland recognizes that employers have a general duty to provide employees with a safe workplace, Md. Labor & Empl. Code Ann. § 5-104, and to provide workers' compensation coverage, Md. Labor & Empl. Code Ann. § 9-501. There is no apparent duty associated with the conduct Timmer has alleged. *See Suburban Hosp., Inc. v. Dwiggins*, 596 A.2d 1069, 1076 (Md. App. Ct. 1991) (refusing to hold that an employer's grievance procedures were legally required to be fair and unbiased because "[a]dding the element of

---

[5] While Timmer alleges a claim for both negligence and negligence per se, he does not identify any specific statutes that confer either a duty or provide for express liability in this context. *See Absolon v. Dollahite*, 831 A.2d 6, 11 (Md. Ct. App. 2003) (explaining that "a statutory violation is evidence of negligence[ but] . . . does not constitute negligence *per se*, unless a statute expressly makes it so").

general fairness and due process to the grievance procedure alters th[e] at-will status"). Timmer has failed to state a claim for negligence under Maryland law.

### F.    Civil Rights under 42 U.S.C. § 1983

"Section 1983 is not itself a source of substantive rights" but instead "provides a method of vindicating rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted). "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021). Timmer has done neither. Timmer alleges that his rights under the "First, Fourth, Fifth, Sixth[,] and Fourteenth Amendments to the United States Constitution[]" were violated when Defendants "acted as private attorneys general in indicting, prosecuting, trying, convicting[,] and sentencing Mr. Timmer for an alleged sexual assault without affording Mr. Timmer fundamental constitutional rights, such as due process of law, equal protection of the laws, the right to confront witnesses against him, the right to be free from self[-]incrimination, the right to the presumption of innocence[,] and the right to trial by jury." (Doc. 42 at ¶ 66.) There is no allegation that Defendants acted under color of state law, and their

25

internal investigation and employment termination decision have no constitutional analog. This claim fails as a matter of law.

### G.    Tortious Interference

"Maryland recognizes the tort of interference with business relationships." *Spengler v. Sears, Roebuck & Co.*, 878 A.2d 628, 641 (Md. Ct. Spec. App. 2005). The elements of this claim are: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[] in [his] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damages and loss resulting." *Id.* (internal quotation marks omitted). It is not enough that there was a "[t]ortious or deliberate intent to harm a plaintiff's business relationship," there must also be proof that the interference "was accomplished through *improper means*." *Id.* at 641–42 (internal quotation marks omitted). Accordingly, the defendant's conduct "must be independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Id.* at 642 (internal quotation marks omitted). Such "improper means" include "violence or intimidation, defamation, injurious falsehood or fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Id.* (internal quotation marks omitted).

26

Here, Timmer alleges that "Defendants have willfully and intentionally interfered with [his] business relationships by attempting to argue that the January 23, 2012 [sic] confidentially [sic] agreement executed by Mr. Timmer at the beginning of his employment has applicability outside of the State of Maryland." (Doc. 42 at ¶ 67.) The alleged conduct, the sending of a cease-and-desist letter, does not fall within Maryland's narrow definition of "improper means." The parties genuinely disagree over whether the portion of the Confidentiality Agreement that prevents Timmer from contacting customers or members of Certified Contractors Network is subject to the geographical limitation contained elsewhere in the Agreement. (*See* Doc. 52-1.) A contract dispute is not interference by "improper means." *Cf. Spengler*, 878 A.2d at 642 (explaining that breach of contract cannot support a tortious interference claim). Accordingly, Timmer's tortious interference claim fails.

## H.    Breach of Contract

Timmer vaguely alleges that "[a]ll of the foregoing" allegations "constitute[] a bad faith breach of contract" by Defendants. (Doc. 42 at ¶ 68.) Timmer has not identified the contract he believes was breached. There are two possibilities. First, there is the Confidentiality Agreement. (*See* Doc. 52-1.) While Timmer alleges Defendants have incorrectly interpreted that contract, this cause of action does not actually identify the putative breach. To the extent he believes Defendants are

27

overreaching in their reading of the geographic scope of the restrictive covenants, such covenants may be enforced "to prevent the future misuse of trade secrets, routes or *lists of clients*, or solicitation of customers." *Allegis Grp., Inc.*, 689 F. Supp. 3d at 120 (quoting *Becker v. Bailey*, 299 A.2d 835, 838 (Md. App. Ct. 1973)) (emphasis added). Defendants' January 2025 "cease and desist" letter was targeted at Timmer's "attempt to solicit [Certified Contractors Network] customers and members," (*see* Doc. 42-1), not his ability to compete in the contractor services market at large. Thus, Timmer's own exhibit contradicts his pleading. S*ee Ritchie*, 342 F.3d at 908 (explaining that courts may consider "documents attached to the complaint" in resolving a motion to dismiss).

Second, if an unwritten employment contract is assumed to exist, "there is no implied covenant of fair dealing with regard to termination by either side in an employment-at-will." *Suburban Hosp., Inc.*, 596 A.2d at 1076–77. Consistently, "[t]he employer or employee may terminate 'at-will' even though to do so might be unfair to the other." *Id.* at 1077. "Unless some public policy is implicated, employee grievance mechanisms should be analyzed for only what they offer; they must not be seen automatically as quasi-judicial forums for final and impartial dispute resolution governed by standards of due process and neutral fairness." *Id.* Timmer has failed to plead a claim for breach of contract.

## I.      Punitive Damages

Finally, Timmer's punitive damages claim cannot survive on its own because a jury must find actual damages before punitive damages may be awarded. *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 246 (Md. App. Ct. 2000).

### CONCLUSION

Based on the foregoing, Defendants' motion to dismiss (Doc. 44) is GRANTED. Timmer's Third Amended Complaint is DISMISSED WITH PREJUDICE. The Clerk is directed to enter Judgment consistent with this Order.

IT IS FURTHER ORDERED that Defendants' motion to transfer (Doc. 53) is DENIED as MOOT.

DATED this _11_ day of May, 2026.

10:30 A. M.

_____
Donald W. Molloy, District Judge
United States District Court

29